UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| Qingdao Ge Rui Da Rubber Co., Ltd., | |
| Plaintiff, | |
| v. | Before: Hon. Mark A. Barnett, Chief Judge |
| United States, | Court No. 22-00229 |
| Defendant, | |
| and | |
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, | |
| Defendant-Intervenor. | |

**RULE 56.2 MOTION ON BEHALF OF PLAINTIFF QINGDAO GE RUI DA RUBBER CO., LTD. FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the U.S. Court of International Trade, Qingdao Ge Rui Da Rubber Co., Ltd. ("GRT"), moves for judgment on the agency record in this action challenging the factual and legal conclusions of the U.S. Department of Commerce in the final results of the administrative review of the countervailing duty order on truck and bus tires from the People's Republic of China covering the January 1, 2020 through December 31, 2020 period of review, *Truck and Bus Tires From the People's Republic of China: Final Results of the Countervailing Duty Administrative Review; 2020*, 87 Fed. Reg. 39,063 (June 30, 2022) ("*Final Results*"), and associated decision and analysis memoranda.

For the reasons set forth in the attached Memorandum in Support of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, the Department's decision to use facts otherwise available with an adverse inference in assigning to GRT a countervailing duty rate in connection with the Export Buyer's Credit Program was unsupported by substantial evidence and otherwise not in accordance with law.  Plaintiff respectfully moves this Court to so hold, remand this case to Commerce to reconsider and revise the decisions in the *Final Results*, and grant such other relief as this Court may deem just and proper.

Respectfully submitted,

/s/ Weronika Bukowski

Dated:  February 17, 2023

Daniel Cannistra
Weronika Bukowski
Michael Bowen

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2595
Tel: 202.624.2902
E-mail: wbukowski@crowell.com

UNITED STATES COURT OF INTERNATIONAL TRADE

Qingdao Ge Rui Da Rubber Co., Ltd.,

      Plaintiff,

   v.

United States,

      Defendant,

   and

United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial and
Service Workers International Union, AFL-CIO, CLC,

      Defendant-Intervenor.

Before:  Hon. Mark A. Barnett,
Chief Judge

Court No. 22-00229

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
<u>RULE 56. 2 MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>**

Dan Cannistra
Weronika Bukowski
Michael Bowen

Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
Email:  wbukowski@crowell.com

*Counsel to Plaintiff*

Dated:  February 17, 2023

**TABLE OF CONTENTS**

PLAINTIFF'S STATEMENT PURSUANT TO USCIT RULE 56.2(c) ....................................... 1

STATEMENT OF FACTS ................................................................................................. 3

ARGUMENT ............................................................................................................... 10

I.     INTRODUCTION ............................................................................................. 10

II.    SUMMARY OF ARGUMENT ........................................................................... 10

III.   LEGAL FRAMEWORK FOR COUNTERVAILING DUTIES UNDER THE TARIFF
       ACT ................................................................................................................ 12

       A.    Requirements for Imposing Countervailing Duties ............................... 12

       B.    Requirements to Apply Adverse Facts Available ................................. 13

       C.    Export Buyer's Credit Program and CIT Jurisprudence......................... 14

IV.    THE DEPARTMENT'S FINDINGS WERE CONTRARY TO THE TARIFF ACT AND
       UNSUPPORTED BY SUBSTANTIAL EVIDENCE ....................................... 15

       A.    The *Final Results* violated 19 U.S.C. § 1677(5)(B) by failing to determine
             whether a benefit was conferred on to GRT and misrepresented record
             evidence ............................................................................................. 15

       B.    The Department's application of adverse facts available was contrary to
             law and inconsistent with established precedent ................................. 17

       C.    Even assuming, *arguendo*, that GRT did not provide customer
             certifications, the *Final Results* continue to be unsupported by substantial
             evidence and contrary to law .............................................................. 26

             1.    The Department's finding violated 19 U.S.C. § 1677(5)(B) because
                   it failed to determine whether a benefit was conferred on to GRT.......... 28

             2.    Commerce failed to provide GRT an opportunity to remedy or
                   verify the evidence it submitted on the record.......................... 29

CONCLUSION............................................................................................................ 31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Archer Daniels Midland Co. v. United States States*,
  917 F. Supp. 2d 1331 (Ct. Int'l Trade 2013) .........................................................13

*Both-Well (Taizhou) Steel Fittings, Co. v. United States*,
  557 F. Supp. 3d 1327 (Ct. Int'l Trade 2022) .........................................................20

*Changzhou Trina Solar Energy Co. v. United States*,
  195 F. Supp. 3d 1334 (Ct Int'l Trade 2016) .....................................................21, 22

*Changzhou Trina Solar Energy Co. v. United States*,
  352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ....................................................13, 19

*Changzhou Trina Solar Energy Co. v. United States*,
  No. 17-00198, Slip Op. 19-137, 2019 Ct. Intl. Trade LEXIS 138 (Nov. 8,
  2019) ...................................................................................................................25

*Changzhou Wujin Fine Chem. Factory Co. v. United States*,
  701 F.3d 1367 (Fed. Cir. 2012).............................................................................3

*Chevron U.S.A. Inc. v. Natural Res. Def. Council*,
  467 U.S. 837 (1984)..............................................................................................2

*Clearon Corp. v. United States*,
  359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) ....................................................20, 25

*Clearon Corp. v. United States*,
  474 F. Supp. 3d 1339 (Ct. Int'l Trade 2020) ........................................................20

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938)..............................................................................................2

*Cooper Kunshan Tire Co.*,
  No. 20-00113, Slip Op. 22-137, 2022 Ct. Intl. Trade LEXIS 145 (Dec. 8,
  2022) ...............................................................................................................22, 24

*Cooper Kunshan Tire Co. v. United States*,
  539 F. Supp. 3d 1316 (Ct Int'l Trade 2021) .........................................................22

*Dalian Meisen Woodworking Co. v. United States*,
  No. 20-00110, Slip Op. 20-110, 2022 Ct. Intl. Trade LEXIS 52 (May 12,
  2022) ...............................................................................................................20, 27

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000).................................................................................................2

*Fujian Yinfeng Imp & Exp Trading Co. v. United States*,
   No. 21-00088, Slip Op. 22-107, 2022 Ct. Intl. Trade LEXIS 106 (Sept. 13,
   2022) ........................................................................................................................23

*Guizhou Tyre Co. v. United States*,
   348 F. Supp. 3d 1261 (Court Int'l Trade 2018) ......................................18, 19, 21

*Guizhou Tyre Co. v. United States*,
   389 F. Supp. 3d 1315 (Ct. Int'l Trade 2019) .........................................................26

*Guizhou Tyre Co. v. United States*,
   399 F. Supp. 3d 1346 (Ct. Int'l Trade 2019) .........................................................20

*Guizhou Tyre Co. v. United States*,
   415 F. Supp. 3d 1335 (Ct. Int'l Trade 2019) ...................................................21, 24

*Guizhou Tyre Co. v. United States*,
   447 F. Supp. 3d 1373 (Ct. Int'l Trade 2020) ...................................................20, 26

*Hartford Fire Ins. Co. v. United States*,
   772 F.3d 1281 (Fed. Cir. 2014).................................................................................3

*Nippon Steel Corp. v. United States*,
   337 F.3d 1373 (Fed. Cir. 2003)...............................................................................19

*Risen Energy Co. v. United States*,
   570 F. Supp. 3d 1369 (Ct. Int'l Trade 2022) ..............................................15, 21, 28

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
   659 F.3d 1142 (Fed. Cir. 2011).................................................................................3

*SKF USA, Inc. v. United States*,
   537 F.3d 1373 (Fed. Cir. 2008).................................................................................2

*Yama Ribbons & Bows Co. v. United States*,
   419 F. Supp. 3d 1341 (Ct. Int'l Trade 2019) ............................................... *passim*

*Yama Ribbons & Bows Co. v. United States*,
   517 F. Supp. 3d 1325 (Ct Int'l Trade 2021)
   ....................................................................................................20, 22, 29, 30

*Yama Ribbons & Bows Co. v. United States*,
   No. 20-00059, Slip Op. 22-157, 2022 Ct. Intl. Trade LEXIS 155 (Dec. 23,
   2022) ........................................................................................................................22

iii

**Statutes**

19 U.S.C. § 1516a ............................................................................................................ 2

19 U.S.C § 1671 ............................................................................................................ 12

19 U.S.C § 1677 ...................................................................................................... *passim*

19 U.S.C § 1677e ..................................................................................................... *passim*

19 U.S.C § 1677m ...................................................................................................... 13, 30

28 U.S.C. § 1581 ............................................................................................................ 2

**Regulations**

19 C.F.R. § 351.303 ......................................................................................................... 5

19 C.F.R.§ 351.511 ....................................................................................................... 29

**Administrative Materials**

*Issues and Decision Memorandum for the Final Determination in the
    Countervailing Duty Investigation of Certain Vertical Shaft Engines Between
    99cc and Up To 225cc*, C-570-125, Barcode No. 4095898-01 (Int'l Trade
    Admin. Mar. 5, 2021) ........................................................................................... 26

*Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof from
    China*, 86 Fed. Reg. 14,071 (Int'l Trade Admin. Mar. 12, 2021)........................ 26

**PLAINTIFF'S STATEMENT PURSUANT TO USCIT RULE 56.2(c)**

**A.     Administrative Determination to be Reviewed**

Qingdao Ge Rui Da Rubber Co., Ltd. ("Plaintiff" or "GRT") contests the final results of
the U.S. Department of Commerce ("Commerce" or "the Department") in the second
administrative review of the countervailing duty ("CVD") order on truck and bus tires from the
People's Republic of China (C-570-041), covering the period January 1, 2020 through December
31, 2020, and published in the Federal Register as *Truck and Bus Tires From the People's
Republic of China: Final Results of the Countervailing Duty Administrative Review*; 2020,
87 Fed. Reg. 39,063 (June 30, 2022) (P.R. 286) ("*Final Results*"); *see also Truck and Bus Tires
from the People's Republic of China: Amended Final Results of Countervailing Duty
Administrative Review, in Part; 2020*, 87 Fed. Reg. 52,364 (August 25, 2022) (P.R. 294).
Plaintiff challenges the Department's factual and legal conclusions underlying this determination
set forth in several memoranda, including but not limited to its June 24, 2022 *Issues and
Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review
of Truck and Bus Tires from the People's Republic of China; 2020* (P.R. 281) ("IDM"),
incorporated by reference in the *Final Results*.

**B.     Issues of Law and Fact Presented**

Whether the Department's decision to use other facts available with an adverse inference
in assigning GRT a 1.78 percent CVD rate under the alleged Export Buyer's Credit Program is
supported by substantial evidence on the record and in accordance with law, given GRT's full
cooperation and provision of evidence establishing non-use of the program during the period of
review.

1

C.      **Reasons for Contesting the Final Results**

Plaintiff contests the *Final Results* because the Department's factual and legal

conclusions are unsupported by substantial evidence on the record and not in accordance with

law.  Plaintiff's reasons for contesting the *Final Results* are explained in detail below in the

*Argument* section of this Memorandum.

D.      **Request for Court Order and Relief Sought**

GRT respectfully requests that the Court rule the Department's finding that GRT used

and benefitted from the Export Buyer's Credit program unsupported by substantial evidence and

not in accordance with the requirements of the Tariff Act of 1930, as amended.  The Court

should remand the *Final Results* to Commerce, instructing the agency to consider all record

evidence in accordance with law.

E.      **Jurisdiction and Standard of Review**

The Court exercises jurisdiction in this matter pursuant to 28 U.S.C. § 1581(c), pursuant

to which the Court reviews actions commenced under section 516A of the Tariff Act of 1930, as

amended ("Tariff Act"), 19 U.S.C. § 1516a, as an action contesting a final determination that

Commerce issues to conclude an administrative review of a countervailing duty order.  *See id.*

§ 1516a(a)(2)(B)(iii).

The Court will hold unlawful agency determinations that are "unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1).

Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed.

Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

In applying its standard of review involving the Department's interpretation of a statute,

the Court must do so within the framework established by *Chevron U.S.A. Inc. v. Natural Res.*

*Def. Council*, 467 U.S. 837, 842–43 (1984).  Under *Chevron*, the Court must first ask whether

Congress has directly spoken to the precise question at issue.  If Congress has done so, the

inquiry ends; the Court "must give effect to the unambiguously expressed intent of Congress."

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (quoting *Chevron*, 467

U.S. at 843).  Commerce must act reasonably and may not be arbitrary and capricious.  *See e.g.*,

*Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir.

2012) ("Commerce's decision will be set aside if it is arbitrary and capricious.").  A clear error

of judgment occurs when an action is arbitrary, fanciful, or clearly unreasonable.  *Hartford Fire*

*Ins. Co. v. United States*, 772 F.3d 1281, 1286 (Fed. Cir. 2014) (quoting *Robert Bosch LLC v.*

*Pylon Mfg. Corp.,* 659 F.3d 1142, 1147–48 (Fed. Cir. 2011)).

## STATEMENT OF FACTS

On April 1, 2021, Commerce initiated the second administrative review of the CVD order

on truck and bus tires from the People's Republic of China, covering the period from January 1,

2020 through December 31, 2020.  *See Initiation of Antidumping and Countervailing Duty*

*Administrative Reviews*, 86 Fed. Reg. 17,124 (April 1, 2021).  Commerce selected GRT as a

mandatory respondent in the review.  GRT is a Chinese producer and exporter of subject truck

and bus tires from China.  GRT is majority-owned by Cooper Tire & Rubber Company

("CTRC"), a publicly-owned U.S. company during the period of review.

On July 14, 2021, both the Government of China ("GOC") and GRT timely submitted

responses to the Department's initial questionnaire.  GOC Initial Questionnaire Response

(July 14, 2021) (P.R. 65–72, C.R. 29–37) ("GOC IQR"); GRT Response to Initial Questionnaire

(July 14, 2021) (P.R. 73–74, C.R. 38–47) ("GRT IQR").  GRT's questionnaire response was

submitted and certified by both GRT and CTRC.  *See* GRT IQR, Cover Letter at 3–4.  The

questionnaire requested information related to the Export Buyer's Credit program ("EBC" or

"EBC Program") from both the GOC and GRT. The EBC program is alleged as an export-promoting loan program administered by the state-owned Export-Import Bank of China ("EX-IM Bank").

In its response to the Department's request for a list of GRT's customers who have EBC loans outstanding, the GOC stated: "Based on the information available to the GOC at this stage, the GOC confirms that none of the respondents' U.S. customers applied for, used, or benefited from the alleged program during the POR {period of review}. Therefore, this question is not applicable." GOC IQR at 106.

The questionnaire then asked, "{i}f you claim that no customer of the respondent companies used buyer credits, please explain in detail the steps the government took to determine that no customer used Export Buyer's Credits." *Id.* at 109. The GOC explained in response that:

> The GOC first contacted the Respondents to ask for their customer lists, which the Respondents provided. This list was then provided to EX-IM Bank, who searched their database to confirm that the customers provided in the list did not receive any Export Buyers Credits from the EX-IM Bank during the POR. Please refer to Exhibit II.F.3 for the screenshots of the search results confirming no use of this program. This database contains records of all Export Buyers Credits issued, regardless of whether a partner/correspondent bank was involved.

*Id.* at 109–10. The GOC further stated that:

> The GOC also advises that whether a foreign buyer receives any loan pursuant to the Export Buyer's Credit program of the EX-IM Bank can be confirmed by the Chinese exporter. If there is a loan issued under EB{CP}, regardless of whether disbursed through a correspondent/partner bank, the Chinese exporter is aware of the buyer's receipt of loans and must be involved in both the loan evaluation process and the post-lending loan management. Therefore, the Chinese exporter is in a position to verify and confirm the existence, if any, of sales contracts that were supported by the Export Buyer's credits of the EX-IM Bank.

*Id.* at 110.  In response to the Department's request for copies of any "laws, regulations or other governing documents cited by the GOC," the GOC appended to the questionnaire copies of the Administrative Measures of Export Buyer's Credit of the Export-Import Bank of China ("Administrative Measures") and the Implementing Rules for the Export Buyer's Credit of the Export-Import Bank of China ("Implementing Rules").  *See id.* at 107.  The GOC explained that, under the Administrative Measures, the "EX-IM Bank must investigate and verify the performance capability of the Chinese exporters in its loan evaluation and approval proceeding," and, under the Implementing rules, the "domestic {Chinese} exporter, not the foreign {U.S.} customer, must submit an application providing an overview of the export project, a project feasibility analysis, and an economic benefit analysis as well as the exporter's credit record."  *Id.* at 111.  In sum, according to information provided by the GOC, if a loan exists under the EBC program, the Chinese exporter (here, GRT) would be involved in and aware of any of its customers' participation in the program.  The GOC's responses were certified to be "accurate and complete," as well as "subject to verification," per 19 C.F.R. § 351.303(g).  *Id.*, Cover Letter at 5.

In GRT's initial questionnaire response, "GRT assert{ed} that none of its customers applied for, used, or benefitted from the {EBC} program during the POR."  GRT IQR at III-27.  GRT also claimed that it "did not provide any assistance to its customers for purposes of receiving any export buyer's credit."  *Id.*  GRT submitted a list of all export customers during the POR, along with their names and addresses.  *Id.* at III-26, Ex. 16.  This list contains a single U.S. customer: CTRC.  *Id.* at III-26–27.  GRT stated in its questionnaire response that:

> CTRC {Cooper Tire & Rubber Company} purchased all the subject tires sold and
> exported by GRT/CTRC to the United States during the POR.  None of CTRC's
> U.S. customers applied for, used, or benefitted from this program with respect to

any purchase of subject tires from CTRC during the POR, nor would they have
been eligible to do so.

*Id.* at III-27.  CTRC is the ultimate parent and indirect majority owner of GRT.  *Id.*, at III-6.

Thus, CTRC, a company affiliated with GRT, was its sole U.S. customer during the POR.  *See*

*id.*, III-6, III-26–27.

In response to the Department's question stating, "{i}f you claim that none of your

customers used buyer credits during the POR, please explain in detail the steps you took to

determine that no customer used the Buyer Credit Facility," GRT confirmed that it was "never

contacted by any of its customers to provide any of the information that is required to obtain an

export buyer's credit" and accordingly asserted that "it is *impossible* that any of {GRT's}

customers could have possibly received export buyer's credit" due to the EBC program's

application process requiring involvement of the Chinese exporter.  *See id.* (emphasis added).

These responses also were certified to be "accurate and complete," as well as "subject to

verification," by both GRT and CTRC.  *See* GRT IQR, Cover Letter at 3–4.

Commerce thereafter submitted a supplemental questionnaire to the GOC to which the

GOC responded on November 22, 2021.  GOC Supplemental Questionnaire Response (Nov. 22,

2021) (P.R. 90, C.R. 52) ("GOC Supp. Questionnaire Resp.").  Questions 14–17 pertained to the

EBC program.  The GOC responded to each of the Department's questions related to the

program.  *Id.* at 6–8.  On December 21, 2021, Commerce issued a supplemental questionnaire to

GRT, to which GRT timely responded.  GRT Section III Supplemental Response (Jan. 6, 2022)

(P.R. 100–103, C.R. 57–63).  The supplemental questionnaire did not include any questions

related to the EBC program.  *See id.*

On March 8, 2022, Commerce published the preliminary results of review, *Truck and Bus*

*Tires from the People's Republic of China: Preliminary Results of Countervailing Duty*

6

*Administrative Review, Rescission of Review in Part, and Intent to Rescind in Part*; 2020, 87 Fed. Reg. 12,929 (March 8, 2022) (P.R. 267) ("*Preliminary Results*"), which incorporated by reference the preliminary decision memorandum, *Decision Memorandum for the Preliminary Results of Countervailing Duty Review* (February 25, 2022) (P.R. 264) ("PDM*"*).  Commerce preliminarily determined, based on adverse facts available, that GRT benefitted from the EBC program and assessed a CVD subsidy rate of 17.15 percent *ad valorem* for GRT, 1.78 percent of which related to the EBC program.  *Preliminary Results*, 87 Fed. Reg. at 12,931; PDM at 16.

Despite the certified and uncontested factual record evidence that GRT did not use the EBC program, Commerce preliminarily determined "that the use of AFA {adverse facts available} is warranted in determining the countervailability of the Export Buyer's Credit Program, because the GOC did not provide the requested information needed to allow Commerce to fully analyze this program."  PDM at 9.  According to Commerce, the GOC refused to provide a copy of an alleged 2013 revision to the Administrative Measures of the EBC program and a list of third-party partner and/or correspondent banks, which the Department claimed is necessary to analyze how the program functions.  *Id.* at 10–11.  Commerce consequently preliminarily determined, based on the GOC's failure to provide these documents, that the EBC program was a financial contribution and met the specificity requirements of the Tariff Act.  *Id.* at 12.  Commerce then found that GRT "claimed that none of its customers used {the EBC} program but did not provide any evidence or declarations to demonstrate its customers did not use this program."  *Id.* at 10.  With respect to finding usage of a subsidy program as required under the Tariff Act, Commerce stated, "we continue to maintain that non-use certificates cannot replace the cooperation of the GOC, but in any event, in this review, the respondents have not even provided non-use certificates for all of their U.S. customers."  *Id.* at

12.  Commerce further claimed that "the GOC's failure to provide the requested information further undermines our ability to verify the respondents' claims of non-use," and concluded "{i}n the absence of evidence from all of GRT's . . . U.S. customers that they did not use the program, we preliminarily find, as AFA" that GRT "used and benefitted from the Export Buyer's Credit Program during the POR." *Id.*  Commerce makes no reference to CTRC nor its certification in this determination.  *See id*.

GRT and the GOC submitted case briefs challenging the Department's preliminary results of review.  GOC Administrative Case Brief (April 7, 2022) (P.R. 273, C.R. 120); GRT's Case Brief (April 7, 2022) (P.R. 274, C.R. 121).  Among the issues challenged, GRT and the GOC contested the Department's determination that GRT used the EBC program, and its application of a CVD subsidy rate of 1.78 percent *ad valorem* to GRT in connection with the EBC program.

Commerce published its *Final Results* in the Federal Register on June 30, 2022, resulting in an assigned total subsidy rate of 16.76 percent *ad valorem* to GRT.  *See Final Results*, 87 Fed. Reg. at 39,064.  The *Final Results* continued to determine, based on AFA, that GRT made use of the EBC program and to assign a rate of 1.78 percent *ad valorem* for this program.  *See* IDM at 7.

Commerce again found that the GOC failed to cooperate and expanded on its two perceived shortcomings with the GOC's responses.  First, the GOC did not provide information related to the 2013 revisions to the Administrative Measures of the EBC program and did not identify all partner/correspondent banks involved in disbursement of funds under the program. IDM at 23–24.  Commerce claimed that this information was necessary and critical to its understanding of the program.  *Id.* at 24.  Second, Commerce requested that the GOC provide

copies of its responses to Commerce from a separate CVD investigation, the *Silica Fabric Investigation*, alleging that in this investigation the GOC had provided certain information related to the EBC program not before Commerce in this proceeding.  *Id.*  The GOC did not provide this document, stating in its responses that "{t}he GOC does not believe that this old questionnaire response is relevant to this proceeding since it was specific to the time period and factual circumstances in that proceeding" and that "{i}f the Department would like information in this old questionnaire, then the GOC respectfully suggests the Department issue a supplemental questionnaire seeking such information."  GOC IQR at 107.  Commerce again requested the document from the *Silica Fabric Investigation* in its supplemental questionnaire to the GOC.  GOC Supp. Questionnaire Resp. at 8.  Ultimately, Commerce claimed that, due to the ECB program's alleged complexity, it required a complete understanding of its operation in order to verify claims of non-use, and that the failure of the GOC to provide this information rendered the Department unable to do so.  *See* IDM at 25–27.

In applying adverse facts available to GRT despite GRT's cooperation, Commerce stated that "we do not have non-use certifications from all U.S. customers of GRT" and therefore "did not take further steps – such as supplemental questions and/or verifications – to fill in the gaps caused by the GOC's non-cooperation and withholding of necessary information."  *Id.* at 17.  The Department further elaborated that "the gaps in the record caused by the GOC's non-cooperation have not been filled by the respondents or their customers in this case" and that "unlike in other recent cases and litigation, the respondents and their U.S. customers in this review did not provide information regarding their U.S. customers use of the EBC program."  *Id.* at 26.  Once again, Commerce made no reference to CTRC and the certification it provided along with the questionnaires.

On August 23, 2022, Commerce issued amended final results of review based on alleged ministerial errors, resulting in a final assigned total subsidy rate of 17.48 percent *ad valorem* to GRT.  *Truck and Bus Tires from the People's Republic of China: Amended Final Results of the Countervailing Duty Administrative Review in Part; 2020*, 87 Fed. Reg. 52,364, 52,365 (Aug. 25, 2022) (P.R. 294).  The subsidy amount related to alleged use of the EBC program remained unchanged.

<u>**ARGUMENT**</u>

## I.   INTRODUCTION

This case challenges a decision by the U.S. Department of Commerce to impose a subsidy on GRT in connection with the EBC Program.  This Court has of late adjudicated several cases related to this export-promoting program.  In a majority of these cases, this Court has rightfully identified many issues with the Department's practice regarding the EBC program.  GRT raises many of the same problems with the Department's findings in the underlying review that the Court has identified in prior proceedings.

This brief will demonstrate that (1) Commerce violated the Tariff Act because it failed to make an affirmative finding that GRT benefitted from the EBC program by ignoring record evidence, (2) Commerce failed to meet the legal requirements to apply "facts otherwise available" with an "adverse inference" to GRT, and (3) the Department's determination contained factual inaccuracies which were unsupported by substantial evidence on the record, or otherwise not in accordance with law.

## II.   SUMMARY OF ARGUMENT

Commerce can only impose a countervailing duty to redress the EBC program if it finds that a financial contribution was provided to GRT and a benefit was thereby conferred.  In actuality, there is no evidence on the record supporting the Department's finding that GRT used

and therefore benefitted from the EBC program, and Commerce explicitly mischaracterized record evidence.  In particular, Commerce maintains that it did not receive a certification from GRT's sole U.S. customer, CTRC.  This is false.  The Department's *Final Results* are therefore unsupported by substantial evidence and not in accordance with law.

The Department's application of "facts otherwise available" and an "adverse inference," together "adverse facts available," to GRT in connection with the EBC program in the underlying review also is unsupported by substantial evidence and otherwise contrary to law.  In order to apply adverse facts available, Commerce must not only identify a gap in the record created by a party's lack of full cooperation, but it must also determine whether any other information on the record could fill that gap that would render adverse facts available unnecessary and inappropriate.  In the underlying review, Commerce failed to properly apply adverse facts available, making the finding that GRT benefitted from the EBC program unsound. Commerce applied adverse facts available to the GOC in analyzing the EBC program because the GOC did not provide requested information allegedly necessary to develop a complete understanding of the program's operation.  Commerce then extended its application of adverse facts available to GRT, a cooperating party, and determined that the company benefitted from the EBC program.  Although Commerce purported to identify missing information in an effort to justify using adverse facts available, nothing identified creates a material gap in the issue of whether GRT used the EBC program.  On that point the record is clear: all of the evidence submitted to Commerce supports a finding that GRT, and CTRC, did not benefit from the EBC program.  Commerce cannot turn away from the complete record evidence supporting a finding of non-use and instead resort to adverse facts available to impute that GRT benefitted from the program.

Because the record evidences verifiable information conclusively demonstrating that neither GRT, nor CTRC, used the EBC program during the period of review, the Department's application of adverse facts available with respect to the EBC program is unlawful – as repeatedly found by the Court upon judicial review in similar circumstances.  Further, in recognition of adverse court precedent on its application of adverse facts available in determining use of the EBC program, Commerce admits that it decided to forego issuing a supplemental questionnaire or attempting to verify GRT and CTRC's claims only because the Department allegedly did not receive a non-use certification from CTRC.  GRT and CTRC were prepared to verify and provide whatever information Commerce required to support their non-use claims.  GRT and CTRC were never given the chance to do so.

Thus, for all these reasons, the Department's decision was unsupported by substantial evidence and otherwise not in accordance with law.  We discuss this in detail below.

## III. LEGAL FRAMEWORK FOR COUNTERVAILING DUTIES UNDER THE TARIFF ACT

### A.   Requirements for Imposing Countervailing Duties

Section 701(a) of the Tariff Act directs generally that Commerce is to import a countervailing duty if: (1) Commerce determines that the government of a country, or any public entity within that country, "is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States"; and (2) the U.S. International Trade Commission determines that an industry in the United States is materially injured or threatened with material injury by reason of the subsidized imports.  19 U.S.C. § 1671(a).

A "countervailable subsidy" generally exists where a governmental authority provides a financial contribution to a person and a benefit is thereby conferred, and the subsidy is specific. *Id.* § 1677(5), (5A).

**B.    Requirements to Apply Adverse Facts Available**

When invoking both sections 776(a) and (b) of the Tariff Act, 19 U.S.C. § 1677e(a), (b), Commerce applies what it terms "adverse facts available," or "AFA."  Commerce may apply AFA in certain circumstances satisfying certain criteria.

Under 19 U.S.C. § 1677e(a), Commerce is directed to use "the facts otherwise available" in specifically-defined circumstances:

> (a) In general. If—
>
> > (1) necessary information is not available on the record, or
> >
> > (2) an interested party or any other person—
> >
> > > (A) withholds information that has been requested by {Commerce} under this subtitle,
> > >
> > > (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
> > >
> > > (C) significantly impedes a proceeding under this subtitle, or
> > >
> > > (D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,
>
> {Commerce} shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

Subsection 1677e(a) has several layers and multiple uses of the disjunctive.  Notably, paragraphs (1) and (2) are in the alternative, joined by the word "or," meaning that Commerce is instructed

to use facts otherwise available only if either necessary information is not available or the circumstances in paragraph (2) apply.  *See id.*

The second step in the "adverse facts available" analysis focuses on whether "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information" from Commerce.  19 U.S.C. § 1677e(b)(1).  If Commerce finds such a failure to cooperate, the Department "may use an inference that is adverse to the interests of that party in selecting from the facts otherwise available."  *Id.* § 1677e(b)(1)(A)–(B).

The Court has held that "Commerce must tread carefully when its use of an adverse inference would injure a cooperating party" because Commerce must provide respondents with a "meaningful opportunity" to submit factual evidence that weighs in their favor.  *See Yama Ribbons and Bows Co. v. United States*, 419 F. Supp. 3d 1341, 1347, 1356 (Ct. Int'l Trade 2019); *see also Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1325 (Ct. Int'l Trade 2018) ("Commerce may apply AFA even if the collateral effect is to 'adversely impact a cooperating party.'  Commerce, however, should 'seek to avoid such impact if relevant information exists elsewhere on the record.'" (*quoting Archer Daniels Midland Co. v. United States*, 917 F. Supp. 2d 1331, 1342 (Ct. Int'l Trade 2013))).  While Commerce found that the GOC did not cooperate in the review in question, it made no such findings with respect to GRT.

### C.    Export Buyer's Credit Program and CIT Jurisprudence

To date, the Court of International Trade has issued over 15 opinions casting doubt on the Department's determinations concerning the EBC program.  In a majority of these cases, this Court has taken issue with the Department's application of AFA in light of the GOC's failure to provide certain operational information related to the EBC program, including: (1) the 2013 revisions to the EBC program, and (2) a list of all third-party banks that are involved in the

program.  Commerce has refused to attempt to verify any claims of non-use when this operational information has not been provided by the GOC, regardless of whether respondents provide unequivocal and unrebutted evidence that they did not use the EBC program.  In certain decisions, the Court has expressed frustration with Commerce for continuing this practice despite growing adverse precedent.  *See, e.g., Risen Energy Co. v. United States*, 570 F. Supp. 3d 1369, 1373 (Ct. Int'l Trade 2022).

The number of decisions striking down the Department's application of the EBC program continues to mount.  This litigation is the latest in a long line of cases where Commerce continues to persistently apply AFA in connection with the EBC program in a manner that is unsupported by substantial evidence and not in accordance with law.

## IV.   THE DEPARTMENT'S FINDINGS WERE CONTRARY TO THE TARIFF ACT AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE

### A.   The *Final Results* violated 19 U.S.C. § 1677(5)(B) by failing to determine whether a benefit was conferred on to GRT and misrepresented record evidence

In the underlying review, Commerce improperly ignored record evidence to reach a finding that GRT benefitted from the EBC program.  The Tariff Act provides for the imposition of a countervailing duty only if a benefit is "conferred" upon a person as a result of a financial contribution.  19 U.S.C. § 1677(5)(B).  Commerce therefore can only impose a countervailing duty to redress the EBC program if it affirmatively finds that a financial contribution was provided to GRT and a benefit was thereby conferred.  *See id.*  In finding that GRT benefitted from the EBC program, Commerce determined that GRT "did not provide any evidence or declarations to demonstrate its customers did not use this program," IDM at 26, and specifically

pointed to the lack of "non-use certifications from all U.S. customers of GRT," *id.* at 17. These

statements are false.

GRT's sole U.S. customer, CTRC, is the majority owner of GRT. GRT IQR at III-6, Ex.

16. In GRT's initial questionnaire response, CTRC certified that it did not use the EBC program.

CRTC's certification in the initial questionnaire states as follows:

> I, Jack Jay McCracken, Vice President, Assistant General Counsel &
> Assistant Secretary for *Cooper Tire & Rubber Company and its majority-owned
> affiliate Qingdao Ge Rui Da Rubber Co., Ltd.* certify that I prepared or otherwise
> supervised the preparation of the attached submission dated July 14, 2021 entitled
> "GRT Response To Initial Questionnaire," regarding the countervailing duty
> administrative review of Truck and Bus Tires from the People's Republic o/China
> (C-570-041) for the period 1/1/20- 12/31/20. *I certify that the public information
> and any business proprietary information of the Company contained in this
> submission is accurate and complete to the best of my knowledge. I am aware
> that the information contained in this submission may be subject to verification or
> corroboration (as appropriate) by the U.S. Department of Commerce.* I am also
> aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes
> criminal sanctions on individuals who knowingly and willfully make material
> false statements to the U.S. Government. In addition, I am aware that, even if this
> submission may be withdrawn from the record of the AD/CVD proceeding, the
> U.S. Department of Commerce may preserve this submission, including a
> business proprietary submission, for purposes of determining the accuracy of this
> certification. I certify that a copy of this signed certification will be filed with this
> submission to the U.S. Department of Commerce.

GRT IQR, Cover Letter at 3 (emphasis added). The above certification covers all the responses

in the questionnaire, including the statement that "GRT asserts that none of its customers applied

for, used, or benefitted from the {EBC} program during the POR." *Id.* at III-27. This

certification was made by the Assistant General Counsel of CTRC, who also acts as the General

Secretary of GRT. CTRC was involved in the preparation of these questionnaire responses and

is represented by the same legal counsel as GRT. Therefore, as a practical matter, these

questionnaire responses were provided by both GRT and CTRC. The Department's finding that

16

CTRC did not provide a certification is therefore false and directly conflicts with record evidence.

In addition to the certified statement provided from its only U.S. customer, GRT submitted to Commerce its export customer list, unequivocally certified that its U.S. customers did not use the EBC program, and also explained that it would be impossible for its U.S. customers to use the program without GRT's knowledge.  GRT IQR at III-26–27.  Further, the GOC's statements and evidence supported GRT's claims of non-use, which the Court has found probative in the past.  *See Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1360 (Ct. Int'l Trade 2019) ("{T}he GOC's statements support {respondent's} claims of non-use").  Specifically, the GOC provided information illustrating the Chinese exporter's role in the EBC program application process.  This information confirmed that GRT would be aware of whether any of its U.S. customers used the program, and that it would be "impossible" for any of GRT's customers to use it without GRT's knowledge.  *See* GOC IQR at 108–11; GRT IQR at III-27.

Commerce is not free to ignore this.  When viewed in the entirety, the record established by GOC and GRT/CTRC shows that no benefit was conferred.  Simply put, Commerce made a finding of benefit in spite of the fact that every piece of evidence indicated that GRT did not use the EBC program.  The Court should remand to Commerce and order the Department to consider all of the evidence on the record.

### B.    The Department's application of adverse facts available was contrary to law and inconsistent with established precedent

Instead of making the requisite finding of whether GRT benefitted from the EBC program, Commerce ignored record evidence and unlawfully reached a conclusion that GRT used the EBC program through an improper application of sections 776(a) and (b) of the Tariff Act.  *See* 19 U.S.C. § 1677e(a), (b).

The GOC timely submitted all materials requested by Commerce and answered each of the Department's questions.  The information the government provided included (1) unequivocal certified statements that GRT did not use the EBC program during the POR, (2) screenshots from the EX-IM Bank confirming there is no record of GRT's U.S. customers in its EBC program database, (3) official program documentation explaining the Chinese exporter's involvement the EBC program application process, and (4) in-depth descriptions of how the EBC program operates.  *See* GOC IQR at 106–11.  GRT separately provided a certification from its sole U.S. customer, certified statements confirming neither it nor its U.S. customers used the program, and a list of its U.S. customers.  *See* GRT IQR.  Conversely, there is ***no*** evidence on the record indicating GRT made use of the EBC program.

However, Commerce ignores the record evidence showing GRT did not use the EBC program because the GOC did not provide information related to the program's general operation.  Specifically, Commerce points to the GOC's failure to provide (1) the alleged 2013 revisions to the Administrative Measures of the EBC program, (2) a list of partner/correspondent banks used to disperse program funds, and (3) a copy of a questionnaire response the GOC submitted in a different, unrelated proceeding.  IDM at 12.  Commerce argues that this information is "necessary for Commerce to analyze how the program functions."  *Id* at 23.

Like it has done in several prior proceedings, Commerce conflates the operation of the EBC program with its use.  *See., e.g., Guizhou Tyre Co. v. United* States, 348 F. Supp. 3d 1261, 1271 (Ct. Int'l Trade 2018) ("Commerce improperly conflates the program's operation with its use"); *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1326 (Ct. Int'l Trade 2018). ("Commerce, however, did not explain why the GOC's failure to explain this program was necessary to assess claims of non-use and why other information accessible to

respondents was insufficient.").  The Department's asserted misgivings with the GOC's responses were irrelevant to the question at hand; namely, whether any of GRT's U.S. customers received export buyer's credits through the program.  Commerce did not raise any issues with the answers provided by the GOC in connection with GRT's usage of the EBC program during the period of review, which unequivocally showed that GRT did not use the program.

Commerce may not resort to facts otherwise available by disregarding information on the record as it did here.  The use of facts otherwise available is only appropriate to fill gaps when Commerce must rely on other sources of information to complete the factual record.  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  There is no ambiguity or uncertainty in the GOC and GRT's statements of non-use, *see Guizhou Tye Co.*, 348 F. Supp. 3d at 1270–71, and therefore no "gaps" in the record what would allow Commerce to resort to other facts available, let alone an adverse inference, *see* 19 U.S.C. § 1677e(a), (b).  This is especially true in cases where AFA is being applied against a cooperative respondent like GRT.  *Yama Ribbons and Bows Co. v. United States*, 419 F. Supp. 3d 1341, 1347 (Ct. Int'l Trade 2019).

The Department's application of AFA in similar cases involving the EBC program has resoundingly been rejected by this Court.  In a large majority of cases involving the EBC program, when cooperative respondents have provided evidence of non-use, the Court has rejected the Department's attempts to apply AFA due to the GOC's inability to provide additional requested information on the program.  For example, in *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1360 (Ct. Int'l Trade 2019), the Court remanded to Commerce holding that the Department's use of AFA was unsustainable because Commerce failed in explaining its determination that the EBC program data allegedly missing met the statutory requirement of necessity that must be satisfied before Commerce may apply AFA.  In *Yama*

*Ribbons & Bows Co. v. United States*, 419 F. Supp 3d 1341 (Ct. Int'l Trade 2019), the Court held

that Commerce erred when it applied AFA to a respondent which stated that it did not use the

EBC program, even when that respondent had not provided customer non-use certifications.  The

court in *Yama* explained that Commerce failed to allow the respondent a meaningful opportunity

to demonstrate it did not benefit from the EBC program and ignored considerable evidence of

non-use already on the record in violation of 19 U.S.C. § 1677(5).  *Id.* at 1356.

Commerce has been slow to adhere to the Court's opinions in cases involving the EBC

program, and the number of cases finding the Department's determinations unsupported by

substantial evidence or contrary to law continue to grow. [1]  Commerce once more recycles the

---

[1] *See, e.g., Dalian Meisen Woodworking Co. v. United States*, No. 20-00110, Slip Op. 20-110, 2022 Ct. Intl. Trade LEXIS 52, at *28 (May 12, 2022) (remanding to Commerce and ordering that Commerce either attempt to verify respondent's claims of non-use or find that respondent did not use the EBC program); *Both-Well (Taizhou) Steel Fittings, Co. v. United States*, 557 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2022) (remanding to Commerce stating that "if Commerce wishes to continue using facts available with an adverse inference, it must attempt to verify non-use certifications."); *Yama Ribbons & Bows Co. v. United States*, 517 F. Supp. 3d 1325, 1340 (Ct Int'l Trade 2021) (finding that Commerce ignored uncontradicted record evidence that the EBC program did not benefit respondent); *Clearon Corp. v. United States*, 474 F. Supp. 3d 1339, 1354 (Ct. Int'l Trade 2020) (remanding to Commerce and ordering that Commerce either attempt to verify respondent's claims of non-use or find that respondent did not use the EBC program); *Guizhou Tyre Co. v. United States*, 447 F. Supp. 3d 1373, 1376 (Ct. Int'l Trade 2020) (sustaining the Department's conclusion "that the factual record in this case indicates that there was no use of the {EBC Program} by {respondent}."); *Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1335, 1343 (Ct. Int'l Trade 2019) (remanding to Commerce and explaining that its decision to apply AFA was unlawful); *Guizhou Tyre Co. v. United States*, 389 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2019) ("{T}he Department's decision to apply AFA as to the Export Buyer's Credit Program based on an alleged lack of cooperation was unlawful because Commerce demonstrated no gap in the record, the respondents submitted evidence of non-use of the Program, and the Department's findings of unverifiability of necessary information {were} unsupported by record evidence."); *Guizhou Tyre Co. v. United States*, 399 F. Supp. 3d 1346, 1353 (Ct. Int'l Trade 2019) ("Commerce has failed to demonstrate why the 2013 {EBC program} rule change is relevant to verifying claims of non-use, and how that constitutes a 'gap' in the record."); *Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261, 1270 (Court Int'l Trade 2018) (remanding to Commerce, noting that although "information as to the functioning of the {EBC} Program was missing, this finding was rendered immaterial by responses from both {respondent

same arguments regarding GOC non-cooperation and inability to verify despite the mounting

adverse case law; a situation this Court has described as "untenable and inequitable." *Risen*

*Energy Co. v. United States*, 570 F. Supp. 3d 1369, 1373 (Ct. Int'l Trade 2022).

While there are a few cases which upheld the Department's application of facts otherwise

available in connection with the EBC program, the facts before the Court in those cases were

distinguishable to the ones at hand.  In *Changzhou Trina Solar Energy Co. v. United States*,

195 F. Supp. 3d 1334 (Ct Int'l Trade 2016), the Court sustained the Department's use of AFA

when Commerce actually went to China and attempted verification but was denied access to the

EX-IM Bank's records.  The Court upheld the Department's reasoning that:

> Absent a well-documented understanding of how an exporter would be involved
> in the application of its customer for an export buyer credit and what records the
> exporter might retain, we would have no way of knowing whether the records we
> review at a company verification necessarily include any applications or
> compliance records that an exporter might have from its participation in the
> provision of export credits to its buyers.

*Id.* at 1355 (citations and quotations omitted).  Here, the GOC did provide an explanation of the

exporter's involvement in the EBC program application process with supporting documentation.

Additionally, unlike in *Changzhou*, Commerce did not actually attempt verification in the

underlying review.

In litigation arising from a prior segment of this administrative proceeding, the Court

sustained the Department's application of AFA to the EBC program when respondent did not

provide non-use certifications.  *See Cooper (Kunshan) Tire Co., Ltd. v. United States*, No. 20-

00113, Slip Op. 22-137, 2022, Ct. Intl. Trade LEXIS 145 (Dec. 8, 2022); *Cooper Kunshan Tire*

*Co. v. United States*, 539 F. Supp. 3d 1316 (Ct Int'l Trade 2021).  Here, unlike in the litigation

---

and the GOC} as to the Program's use.  This defect proves fatal to Commerce's imposition of
AFA.").

arising from the prior segment of the administrative proceeding, GRT is contesting the Department's finding that GRT did not provide customer certifications.

In *Yama Ribbons and Bows*, No. 20-00059, Slip Op. 22-157, 2022 Ct. Intl. Trade LEXIS 155 (Dec. 23, 2022), the court found the GOC failed to provide any POR-specific information to Commerce.  Instead, the GOC merely re-submitted its questionnaire responses from a prior review along with a one-page cover letter from respondent's counsel.  *Id.* at *10.  The Court emphasized that the GOC's responses to EBC program-related questions "would have provided responsive, and probative, information had it pertained to measures the Chinese government undertook during the calendar year 2017 {i.e., the POR}."  *Id.* at *15.  This is not an issue here. The GOC timely provided POR-specific questionnaire responses.  Moreover, with respect to the two prior segments of the underlying proceeding in *Yama*, when the GOC provided POR-specific information similar to what is provided in the underlying review at hand, the Court found the Department's findings that the respondent used the EBC program to be unsupported by substantial evidence and contrary to law.  *See Yama Ribbons & Bows Co. v. United States*, 517 F. Supp. 3d 1325, 1341–42 (Ct. Int'l Trade 2021); *Yama Ribbons & Bows Co. v. United States*, 419 F. Supp. 3d 1341, 1356–57 (Ct. Int'l Trade 2019).

Finally, *Fujian Yinfeng Imp & Exp Trading Co. v. United States*, No. 21-00088, Slip Op. 22-107, 2022 Ct. Intl. Trade LEXIS 106, at*10 (Sept. 13, 2022), appears to go against established case law on the EBC program by denying a respondent's Rule 56.2 motion and sustaining the Department's finding that the GOC failed to provide the necessary information to determine whether the EBC program was used, even when respondent reported no receipt of EBC program benefits and submitted certifications of non-use.  Further, the respondent in *Yinfeng* appears to have had numerous U.S. customers such that the information requested from

22

the GOC could have arguably aided in limiting the scope of verification. *Id.* at *6. In this case, GRT only has one U.S. customer which is also its parent company.

Despite the adverse case law, to justify its application of AFA in light of not receiving operational documents related to the EBC program, Commerce speculates about how verification of non-use might be onerous or impossible without additional information pertaining to the EBC program. Commerce explained that "{g}iven the complicated structure of loan disbursements which can involve various banks for this program, Commerce's complete understanding of how this program is administered is necessary to verify claims of non-use." IDM at 25. The Department's concern appears to be two-fold. First, Commerce claims that the 2013 revisions to the Administrative Measures of the program "appear to be significant and have impacted a major condition in the provision of loans under the program, i.e., by eliminating the $2 million minimum." *Id.* at 24. Second, Commerce explains certain information from prior proceedings indicated that "under the EBC program, credits are not direct transactions from the China Ex-Im Bank to the U.S. customers of respondent exporters." *Id.* at 26. Based on this reasoning, Commerce found that "we cannot know the banks that could have disbursed export buyer's credits to a company respondents' customers," *id.*, and that "if the program is no longer limited to $2 million contracts, this increases the difficulty of verifying loans," *id.* at 24

Such speculation is legally insufficient. As this Court observed previously in a similar case: "{U}ntil the Department actually *attempts* verification and adequately confronts these (purportedly) insurmountable challenges, there is little for the Department to hang its hat on when it continues to find a gap in the record." *Guizhou Tyre*, 415 F. Supp. 3d 1335, 1405 (Ct. Int'l Trade 2019) (internal quotations omitted).

Commerce has also failed to explain why it would be unable to obtain the information necessary from GRT and CTRC, who have demonstrated their willingness to cooperate throughout the proceeding.  Indeed, as certified in the questionnaire responses, GRT and CTRC expressly declared their understanding and willingness to subject to verification.  GRT IQR, Cover Letter at 3–4 ("I am aware that the information contained in this submission may be subject to verification.").

Verification of GRT and CTRC's non-use claims would have been a straightforward exercise and unimpacted by the perceived lack of documents on the EBC program's operation. First, the Department's concerns about the removal of the $2 million threshold is unwarranted in cases where only a single U.S. customer exists.  *Cooper Kunshan Tire Co.*, 2022 Ct. Intl. Trade LEXIS at *47 ("If Cooper Tire exported to only one U.S. customer, CTRC, which was already a party to the action, as the record supports and the Government concedes, the need for the threshold requirement to limit appropriately Commerce's inquiry would not appear to be necessary.").[2]  Second, with respect to lacking a list of third-party banks, as long as Commerce is able to access the importer and exporter's records, "it appears that Commerce could cross-reference the records to see if any funds appear to originate from the EX-IM banks, even if the funds went through an intermediary bank at some point."  *Changzhou Trina Solar Energy Co. v. United States*, No. 17-198, Slip Op. 19-137, 2019 Ct. Intl. Trade LEXIS 138, at *10 (Nov. 8, 2019).  This would be particularly straightforward in this case because GRT only has a single U.S. customer who is an affiliate.  *Id.* at *10–11.

---

[2] The Department's concerns related to not receiving the GOC questionnaire response from the *Silica Fabric Investigation* is also of no merit for the very same reason.  Commerce requested this information solely because of its concern about the alleged removal of the $2 million threshold.  *See* IDM at 24.

Finally, GRT and CTRC already provided a great deal of financial information on the record. GRT's own annual financials are captured and recorded in CTRC's annual reports, both of which were provided on the record and available to the Department as of CTRC/GRT's initial questionnaire response. *See* GRT IQR at III-11 ("GRT's financial statements ultimately are consolidated with its ultimate parent company, CTRC"), Exhibit 17. CTRC/GRT provided excerpts from CTRC's annual reports and Form 10-K filings, including consolidated financial statements for the last three fiscal years from the end of the POR. *Id.* at III-11. CTRC's complete annual reports and Form 10-K filings are also publicly available. *Id.* (providing a link to publicly available statements). As far as GRT and CTRC were aware, the substantial financial information provided was sufficient to substantiate claims of non-use as the Department did not issue any supplemental questions suggesting otherwise or request any follow-up information regarding CTRC's financials or the EBC program.

It is unclear why the Department failed to even address the record information supporting CTRC's claim of non-use in this case, while Commerce has before found the same or similar evidence to be dispositive as to the question of non-use. For example, in the 2021 CVD investigation of *Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof from China* ("*VSE from China*"), Commerce determined without verification that the mandatory respondent, Chongqing Kohler, did not benefit from the EBC program. In that case, the respondent's only customer was its U.S. parent company, Kohler, Co. In support of its claims of non-use, Chongqing Kohler provided certified statements of non-use, in addition to Kohler, Co.'s financial statements showing Kohler's outstanding loan balances. Without issuing any requests for further information, or supplementary questions, the Department determined on the basis of

facts available that Chongqing Kohler did not use this program during the period of investigation:

> Here, we find that the unique circumstances in this case allow Commerce to rely on the facts available to find that Chongqing Kohler did not use the EBCP. As explained above, Chongqing Kohler had only one customer during the {period of investigation}, its parent company, for which it was able to provide extensive documentation of a kind that can fill some of the gaps of the record necessary to Commerce's inquiry. Although this information was not subject to verification, leaving potentially relevant questions unanswered, we find that the information is sufficient in this particular instance to find non-use with regard to Chongqing Kohler.

*Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of VSE from China*, C-570-125, Barcode No. 4095898-01, at 23 (Mar. 5, 2021). Similarly, in this case, GRT provided a statement of non-use certified by CTRC, its parent company and sole U.S. customer, in addition to extensive financial documentation. Taken together, this record information substantially narrows the universe of inquiry with respect to this issue and virtually eliminates any alleged difficulties in verifying non-use

All in all, had Commerce attempted to verify GRT and CTRC's claims of non-use in the underlying proceeding, it would have been met with very straightforward verification procedure. Because it failed to do so, the Department's subsequent findings are unsupported by substantial evidence and otherwise contrary to law.

### C. Even assuming, *arguendo*, that GRT did not provide customer certifications, the *Final Results* continue to be unsupported by substantial evidence and contrary to law

Assuming, *arguendo*, that Commerce correctly found that GRT did not provide customer certifications, the Department's inference that GRT benefitted from the EBC program would continue to be unsupported by substantial evidence and not otherwise in accordance with law.

The Department's refusal to proceed with verification or additional questionnaires because of its (incorrect) finding that non-use certifications were not provided in the initial questionnaire prepared by GRT and CTRC is a recent change in practice. Commerce describes its new practice generally as follows:

> Commerce continues to apply AFA for the GOC's failure to cooperate, but that — when the full universe of a respondent's U.S. customers voluntarily supplies certifications of non-use — Commerce has determined to take additional steps toward ultimate verification of such certifications, despite the GOC's continued refusal to provide certain information. Specifically, we may issue supplemental questions seeking complete lending information from the U.S. customers and then take steps to verify the customers' responses where the voluntary information provided covers the full universe of financing for all of a respondent's U.S. customers, which allows Commerce to meaningfully conduct its tracing and completeness tests at verification.

Remand Results at 14, *Dalian Meisen Woodworking Co. v. United States*, No. 20-00110, ECF No. 86 (Aug. 5, 2022) (continuing to find Commerce is un-able to verify non-use of EBC program after reopening the record because respondents did not provide complete information of financial activities for all of their U.S. customers); *see also* Remand Results, *Risen Energy Co., Ltd. v. United States*, No. 19-00153, ECF No. 94 (Oct. 7, 2022) (finding that Commerce was able to verify non-use of the EBC program for a respondent that provided certifications from all customers, but not for a respondent that provided certifications from half its customers).[3]  In sum, Commerce has taken a two-step approach: a respondent first must provide certifications of non-use for all of its U.S. customers, and only then will Commerce attempt to verify claims of non-use or issue additional questionnaires.

In the underlying review, Commerce explained in the final issues and decision memorandum that while "Commerce continues to rely on AFA when the GOC fails to cooperate

---

[3] The Court has yet to rule on whether these remand redeterminations are supported by substantial evidence and lawful.

. . . in recognition of court precedent," Commerce will consider information respondents provide

to fill the "gap" in the record stemming from the GOC's failure to cooperate.  IDM at 17.  In

practice, however, Commerce appears to only consider any evidence of non-use if non-use

certifications from all U.S. customers are provided in response to initial questionnaires.  This

approach is flawed and does not remedy the issues this Court has identified with the

Department's determinations in EBC program-related cases.  First, the Department's

methodology violates the Tariff Act because Commerce still would have failed to determine

whether a benefit was conferred on GTC.  Second, Commerce deprived a cooperating respondent

of the opportunity to verify the information it already placed on the record.

### 1.   The Department's finding violated 19 U.S.C. § 1677(5)(B) because it failed to determine whether a benefit was conferred on to GRT

Commerce can only impose a countervailing duty to redress the EBC program if it

affirmatively finds that a financial contribution was provided to GRT and a benefit was thereby

conferred.  *See* 19 U.S.C. § 1677(5)(B).  Instead of deciding whether the record evidence did or

did not support a finding that GRT used or benefitted from the EBC program, Commerce

essentially determined that the record evidence did not allow it to find that GRT did not use or

benefit from that program.  Commerce stated that GRT "did *not* provide any evidence or

declarations to demonstrate its customers did *not* use this program."  *Id.* at 26 (emphasis added).

Commerce turns its statutory obligation to make affirmative findings on its head and places GRT

in in the position of proving a negative.  *See Yama*, 419 F. Supp. 3d at 1348; *Yama*, 517 F. Supp.

3d at 1329.  This is not what the statute requires.

This is evidenced by the Department's general practice for other subsidy programs.  For

example, for an input for less than adequate remuneration ("LTAR") under 19 C.F.R.§ 351.511,

Commerce permits respondents to state that they did not use the program.  In such instances, an

allegation will be made that respondents purchase certain inputs for LTAR.  If the respondent does not purchase those inputs, it can simply say that it does not use the program. Commerce does not require the company to report every input it does purchase to show that it does not purchase certain target inputs.

Ultimately, even had GRT not provided a non-use certification from CTRC with its initial questionnaire response, Commerce cannot ignore record evidence.  As discussed above, apart from its sole customer certification, GRT provided its U.S. customer list, unequivocally certified that its U.S. customers did not use the EBC program, and also explained that it would be impossible for its U.S. customers to use the program without GRT's knowledge.  GRT IQR at III-26–27.  Since CRTC is an affiliate, GRT is able to say with certainty that CRTC, its only U.S. customer, did not use the program.

### 2. Commerce failed to provide GRT an opportunity to remedy or verify the evidence it submitted on the record

GRT's claims of non-use were subject to verification and could have been verified if Commerce believed it could not rely on the answers provided by GRT and the GOC.  *Yama Ribbons & Bows Co.*, 517 F. Supp. 3d at 1330 ("{T}he record evidence does not support a finding that the information Commerce lacked as a result of non-cooperation by the Chinese government prevented Commerce from relying upon or verifying the information {the respondent} provided.").  However, Commerce chose not to verify these responses.  Instead, Commerce refused to take any further steps in the review because GRT did not submit a separate non-use certification from CTRC other than the certification CTRC appended to the initial questionnaire.  IDM at 17 ("{W}e do not have non-use certifications from all U.S. customers of GRT . . . Therefore, we did not take further steps – such as supplemental questions and/or verification.").  The Department's application of the rigid rule that it will verify EBC program

29

non-use claims, or even issue supplemental questionnaires, only if non-use certifications are submitted is contrary to law because, by definition, it requires Commerce to ignore all other evidence on the record supporting GRT's claims.

Either verification or a supplemental questionnaire would have solved any concerns Commerce had with GRT and CTRC's initial responses. Indeed, Commerce has an obligation to notify a party of a deficiency and to provide the party, when practicable, "an opportunity to remedy or explain the deficiency," before applying AFA. 19 U.S.C. § 1677m(d). By immediately inferring that GRT used the EBC program, Commerce violated this obligation. If Commerce preferred to receive CTRC's certification in some other form, it could have requested it. GRT and CTRC fully cooperated and stood ready to verify their assertions of non-use. They did not get the opportunity to do so.

In *Yama Ribbons and Bows Co. v. United States*, 419 F. Supp. 3d 1341 (Ct. Int'l Trade 2019), this Court found that Commerce acted contrary to law by failing to provide a respondent the opportunity to verify its claims even when the respondent did not provide customer certifications. In *Yama*, the court explained:

> Defendant-intervenor argues that Yama should have obtained certifications of non-use from each of its customers, but the absence of such certifications is not a justification allowing Commerce to ignore the record evidence that existed. There is no basis in the record upon which it reasonably could be presumed or speculated-as Commerce apparently did-that a Yama customer could have obtained or participated in a loan under the Export Buyer's Credit Program about which both (1) the EX-IM Bank had no record and (2) Yama and the customer itself were unaware.

*Id.* at 1355 (citation omitted). Here, as in *Yama*, GRT provided evidence that it and its customers did not use the EBC program and the EX-IM Bank also indicated it had no records on GRT's customers. By ignoring this evidence, Commerce failed to provide GRT a "meaningful opportunity" to submit factual evidence that weighs in their favor. *See id.* at 1356.

The Department's choice not to verify nor further investigate GRT and CTRC's assertions, along with the requirement that its finding must be based on substantial evidence on the record, should have resulted in a finding of non-use in the *Final Results*.

## **CONCLUSION**

For these reasons discussed in this brief, the Court should rule in accordance with the argument contained herein.  Thus, GRT respectfully requests this Court to remand this case to Commerce with the appropriate instructions.

Respectfully submitted,


/s/ Weronika Bukowski
Weronika Bukowski


Daniel Cannistra
Weronika Bukowski
Michael Bowen

Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
Email:  wbukowski@crowell.com

*Counsel to Plaintiff*

UNITED STATES COURT OF INTERNATIONAL TRADE

Qingdao Ge Rui Da Rubber Co., Ltd.,

              Plaintiff,

     v.

United States,

              Defendant,

     and

United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial and
Service Workers International Union, AFL-CIO, CLC,

              Defendant-Intervenor.

Before: Hon. Mark A. Barnett,
Chief Judge

Court No. 22-00229

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to U.S. Court of International Trade Rule 2(b)(2) of the Court's Standard
Chambers Procedures, undersigned counsel for Plaintiff GRT, certifies this brief complies with
the Court's type-volume limitation rules.  This brief contains no more than 9,723 words and
therefore does not exceed 10,000 words.  This brief also complies with all typeface and margin
requirements.

Respectfully submitted,

/s/ Weronika Bukowski
Weronika Bukowski

*Counsel to Plaintiff*